UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIM. NO. 5:23-09-KKC-MAS |
| Plaintiff, | |
| V. | OPINION AND ORDER |
| JOSE ALZADON, M.D., MICHAEL BREGENZER, and BARBIE VANHOOSE, | |
| Defendants. | |

*** *** ***

This matter is before the Court on the motions for a judgment of acquittal or, alternatively, for a new trial (R. 271, 272) filed by defendants Dr. Jose Alzadon, Michael Bregenzer, and Barbie Vanhoose.

Defendant Bregenzer was the CEO and majority owner of Kentucky Addiction Centers (KAC), a group of opioid addiction treatment clinics in Kentucky. Defendant Vanhoose was a billing manager at KAC. Defendant Dr. Alzadon was a licensed medical doctor who worked at KAC.

KAC billed insurance companies and Medicare and Medicaid for treatment provided at the clinics. Medical billing involves inputting certain codes that signify to the payor what medical services were provided. The government presented evidence of three kinds of fraudulent billing by KAC: 1) KAC "upcoded," meaning it billed under medical codes that indicated it provided more medical services than it actually provided; 2) KAC billed for medical services it did not provide at all like counseling for smoking cessation; and 3) KAC represented to the payor that healthcare services were provided by Dr. Ricardo Alzadon

when they were actually performed by his son, defendant Dr. Jose Alzadon.[1] The government presented evidence that KAC engaged in the third kind of fraudulent billing because KAC representatives believed defendant Dr. Alzadon was not credentialed to bill certain insurers.

The government also presented evidence that doctors must register with the United States Drug Enforcement Agency ("DEA") to obtain a unique identification number that allows them to prescribe a controlled substance like Suboxone. Federal law prohibits a person from using another person's DEA identification number to prescribe a controlled substance like Suboxone. 21 U.S.C. § 843(a)(2). When doctors prescribe medications electronically, they must go through a dual-factor verification. First, they must log into the system by entering a password. For the second factor, doctors can use an electronic prescribing "token." (R. 251 Tr. Terry 76.)  When a doctor sends a prescription, an authentication code appears on the token, which the doctor must enter to prove that the physician has authorized the prescription. The authentication code must be entered to prescribe the medication. (R. 251 Tr. Terry 85-86.) The defendants were charged with conspiring to use Dr. Ricardo's DEA identification number and token to distribute Suboxone.

A jury found the defendants guilty of one count of conspiring to commit health care fraud, eight counts of healthcare fraud, and one count of conspiring to unlawfully distribute a controlled substance through the use of another person's DEA registration number. Defendants Alzadon and Vanhoose were also found guilty of two counts of aggravated identity theft for using, in connection with healthcare fraud, Dr. Ricardo's National

---

[1] To distinguish defendant Dr. Jose Alzadon from his father, the Court will refer to the father as Dr. Ricardo in this opinion.

Provider Identification (NPI) number, a unique number assigned to each healthcare provider. (R. 256 Tr. 194-95; R. 251 Tr. 61.)

## I.    Standards on Rule 29 and 33 Motions

"Rule 29 . . . tests only the sufficiency of the evidence introduced at trial to support the crime charged." *United States v. Hope*, 487 F.3d 224, 225 (5th Cir. 2007). *United States v. Gonzalez-Pujol*, No. CR 13-40-ART-(4), 2016 WL 10920573, at *1 (E.D. Ky. Feb. 10, 2016) ("A court may enter a judgment of acquittal under Rule 29 only when the evidence is insufficient to prove the charged offense."); Fed.R.Cr.P. 29(a).

Defendants claiming insufficiency of the evidence have a "very heavy burden." *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016) (citation omitted). In reviewing a claim of insufficient evidence, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)). Importantly, the Court must "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *United States v. Maliszewski,* 161 F.3d 992, 1006 (6th Cir. 1998). The Court will "reverse a judgment for insufficient evidence only if the judgment is not supported by substantial and competent evidence upon the record as a whole." *Vichitvongsa*, 819 F.3d at 270 (quoting *United States v. Stewart*, 729 F.3d 517, 526 (6th Cir. 2013)). "'Substantial evidence' is 'such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred." *Id.* (quoting *United States v. Taylor*, 800 F.3d 701, 711 (6th Cir. 2015)).

Under Rule 33(a), the Court may set aside the verdict and grant a new trial if the "interest of justice" requires that. A Rule 33 motion "can be premised on the argument that

the 'verdict was against the manifest weight of the evidence,' and it can be premised on the argument that 'substantial legal error has occurred.'" *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015) (quoting *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir.2010)). "When considering a motion for new trial based upon the weight of the evidence, district judges can act in the role of a 'thirteenth juror' and consider the credibility of the witnesses and the weight of the evidence." *Id.* at 616–17 (6th Cir. 2015) (quoting *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir.1998)). "Motions for a new trial are not favored and are granted only with great caution." *United States v. Fritts*, 557 F. App'x 476, 479 (6th Cir. 2014) (quoting *United States v. Garner*, 529 F.2d 962, 969 (6th Cir.1976)). The defendant "bears the burden of proving that a new trial should be granted." *Id.* (quoting *United States v. Davis*, 15 F.3d 526, 531 (6th Cir.1994)).

## II.    Bregenzer's Motions

### A.  Rule 29 Motion

In his motion, the only count that Bregenzer specifically alleges the government failed to prove is the charge for conspiring to unlawfully distribute Suboxone, a controlled substance, using another person's DEA registration number. Bregenzer argues that the government failed to prove this charge because every prescription was "medically necessary" and was "authorized by a medical provider for a legitimate medical condition." (R. 271 Motion 17.)

It is a federal crime to "use in the course of the . . . distribution[] or dispensing of a controlled substance . . . a registration number which is . . . issued to another person." 21 U.S.C. § 843(a)(2). Whether the prescriptions were "medically necessary" or prescribed "for a legitimate medical condition" is not relevant to this charge.

The Court instructed the jury that the superseding indictment charged that this

4

crime happened in two ways. First, that the defendants "knowingly and intentionally conspired to use or cause others to use Dr. Ricardo Alzadon's DEA registration number for the controlled substance prescriptions that he did not authorize and were in fact authorized by Dr. José Alzadon." Second, "that the defendants knowingly and intentionally conspired to possess or cause other KAC personnel to possess electronic tokens that were required to remain in the possession of KAC medical personnel who were prescribing controlled substances, including Dr. José Alzadon and Dr. Ricardo Alzadon." (R. 224 Instruction No. 16.)

The government presented evidence that defendant Dr. Alzadon prescribed his patients Suboxone using his father's registration number and that KAC staff used the registration numbers of both Dr. Alzadon and Dr. Ricardo to send prescriptions for controlled substances. Further, the government presented evidence that Bregenzer knew about and agreed to these practices.

The government presented multiple e-script prescriptions for Suboxone purporting to be signed by Dr. Ricardo. (Gov. Ex. 151-56.) Former KAC office manager Janet Skaggs testified that Bregenzer was in the office when the front office staff used the tokens to send prescriptions. (R. 255 Tr. 25.) Former KAC office manager Alexis McCutcheon testified that she confronted Bregenzer about the front office using the tokens, and that Bregenzer responded, "This is the way things have been running. This is the way they've always ran." (R. 244 Tr. 84-85.) She testified that nothing changed after that confrontation. (R. 244 Tr. 87.)

Dr. Cheryl McClain is a medical doctor who specializes in addiction medicine. She worked at KAC for two weeks beginning September 17, 2019 but resigned due to ethical concerns about KAC's billing practices. (R. 244 Tr. 215, 219.) The government presented emails that Dr. McClain sent to KAC representatives including Bregenzer and Dr. Alzadon

about various concerns with KAC practices including allowing staff to use the electronic tokens that belonged to physicians to issue prescriptions. (Gov. Ex. 1, 2; R. 245 Tr. 83.)

Dr. McClain testified that she confronted Bregenzer about Dr. Alzadon using Dr. Ricardo's credentials to prescribe medications. (R. 245 Tr. 65.) She testified that Bregenzer stated he was going to fire Dr. Alzadon. (*Id.* 66-67.) But that never occurred.

As to why that never occurred, Kristy Berry provided an explanation. She was a nurse and part-owner of KAC. She pleaded guilty to conspiring with Dr. Alzadon, Bregenzer, and Vanhoose to commit healthcare fraud and to unlawfully distribute controlled substances. She explained that a company called BHG had offered to buy KAC for $22 million. The price was based on KAC's revenue. (R. 252 Tr. 106-07.) The higher KAC's revenue, the more it was worth. (*Id.*) Berry explained that Dr. Alzadon was KAC's "revenue maker"; he generated more revenue than anyone at KAC. (*Id.* at 109.) Bregenzer feared that, if he fired Dr. Alzadon, he would take all his patients with him, significantly decreasing KAC's revenue and its value to BHG. (*Id.* at 110-11.)

The government presented a text message from Berry to Bregenzer in which she stated that Vanhoose would not allow a particular KAC non-physician employee to "send meds." (Gov. Ex. 473.) Berry testified that this referred to the employee using the physician tokens to send prescriptions. (R. 252 Tr. 105.) Bregenzer responded that they "might need to have a talk with" Vanhoose. He never instructed that the staff should not use physician tokens to "send meds."

This is sufficient evidence from which a rational juror could convict Bregenzer of conspiring to distribute a controlled substance using another person's DEA registration number.

In his reply brief, Bregenzer argues that the government presented insufficient evidence that he agreed to commit healthcare fraud as required for the conspiracy charged

6

in Count 1 and that it presented insufficient evidence that he acted with intent to commit the individual counts for healthcare fraud. "It is well-established that a party may not raise new claims or arguments, including claims for ineffective assistance of counsel, for the first time in a reply brief." *United States v. Everson*, No. 3:18-CR-727, 2023 WL 3479176, at *3 (N.D. Ohio May 16, 2023) (citing cases). Nevertheless, the Court will address these arguments.

As to the conspiracy charge, Bregenzer does not dispute that the government presented sufficient evidence that KAC engaged in the three kinds of fraudulent billing practices discussed above. He argues that the government did not present sufficient evidence that he agreed to engage in them.

Dr. McClain testified, however, that she raised various billing concerns to Dr. Bregenzer. In addition to concerns about KAC staff using physician tokens to send prescriptions for controlled substances as discussed above, Dr. McClain's email to Bregenzer and others at KAC raised various concerns about KAC's billing practices. These included Dr. Alzadon treating patients under Dr. Ricardo's name. (Gov. Ex. 1, 2; R. 245 Tr. 71; R. 245 Tr. 83); "obvious" cloned notes (R. Tr. 84)[2]; and possible charging for services that were not rendered. (R. 245 Tr. 87.) In explaining this last concern, Dr. McClain testified that she discovered that her medical charts indicated that she provided every patient smoking cessation counseling, but she never rendered that service while at KAC. (R. 245 Tr. 87.)

---

[2] Dr. McClain explained that "cloned notes" are medical notes that are not unique for each patient visit but instead duplicated into multiple patients' charts. (R. 244 Tr. 224-29.) She testified that she noticed cloned records for Dr. Alzadon's and Dr. Ricardo's patients during July and August 2019. (R. 244 Tr. 225.) She testified that it is not appropriate to bill for services reflected in "cloned notes."

Dr. McClain testified that, after this email, she had a phone call with various KAC representatives including Bregenzer and Berry. (R. 245 Tr. 89-90.) She recommended to Bregenzer that KAC "self report" the billing irregularities to state or federal authorities and try to figure out a plan going forward. (R. 245 Tr. 91-92.) She later notified Bregenzer of a specific date in which the charts for every patient on her schedule had progress notes that she did not do. The notes were cloned notes. She was concerned that KAC was billing for services she did not render. (Gov. Ex. 3; R. 245 Tr. 93-94.)

Dr. McClain testified that most patients seen at KAC would be billed under either a 99213 ("Level 3") or a 99214 ("Level 4") code. (R. 245 Tr. 77.) She learned that KAC's billing policy was that, no matter the services provided, KAC would bill all Medicare patients under the 99214 code, which reimburses more than a 99213 code. (R. 245 Tr. 95-97.) This was because Medicare would pay for 99214-coded services while, at the time, Medicaid paid only for 99213 services. (R. 245 Tr. 95-97.) Dr. McClain said it was apparent that KAC was going to charge for services that she did not render, and she was concerned that she would be perceived as complicit in that billing practice. (R. 245 Tr. 98.) She raised these concerns with Bregenzer. (R. 245 Tr. 99, 100-01; Gov. Ex. 4.)

Via email to various KAC representatives, including Bregenzer, Dr. McClain also raised concerns about KAC billing for smoking cessation counseling sessions under her name when she did not provide those services. (R. 245 Tr. 101; Gov. Ex. 4.) She testified that she never provided smoking cessation counseling services at KAC. (R. 245 Tr. 109.)

Berry testified that, after meeting with Dr. McClain, Bregenzer told Berry that KAC could not self-report as Dr. McClain had suggested because they would have to pay money back to the insurers and that would "break the company," meaning they could not sell KAC. (R. 252 Tr. 91.)

Berry testified that Bregenzer knew everything going on at KAC "inside and out."

8

(R. 252 Tr. 30.) She testified that Bregenzer was aware of Dr. Alzadon's problems getting credentialed with certain insurers. (R.252 Tr. 29-30.) He was also aware that Dr. Alzadon was seeing patients and billing as though his dad had seen them. (R. 252 Tr. 17-18, 31.) Berry testified she had discussions with Bregenzer about this practice beginning in 2018 and that "we just let it go." (R. 252 Tr. 32.) Berry testified that, in 2019, Dr. McClain told her and Bregenzer that this was fraud and illegal. (R. 252 Tr. 34.)  Berry testified that she and Bregenzer discussed this billing practice at least a dozen times. (R. 252 Tr. 36.) She testified that Bregenzer told her that, if Dr. Alzadon was accused of misconduct for this practice, he and Berry should "stick together" and say they knew nothing about it. (R. 252 Tr. 36.) Bregenzer said he would blame Dr. Alzadon. (R. 252 Tr. 37.) Berry testified that she was at a meeting on October 21, 2019 when Dr. Alzadon told Bregenzer that he was seeing patients under his dad's name and that there was nothing wrong with that. (R. 252 Tr. 39.)

Berry testified that Bregenzer was also aware that offices visits were upcoded. (R. 252 Tr. 17-18.) The government presented a text message from Bregenzer to Berry in which Bregenzer complains that the Winchester office had "way too many 30-minute [counseling] sessions. . .they are slacking. . . Just letting you know it's costing us significant money. 2/3 sessions are 30 minutes." (Gov. Ex. 468; R. 252 Tr. 47-48.) Berry testified that Bregenzer wanted the providers to have one-hour sessions with patients. (R. 252 Tr. 48.)

Berry testified that Bregenzer watched the numbers very closely, and when there was a dip in the number, he instructed staff to keep patients longer and bill for other services. (R. 252 Tr. 56-57.) She said Bregenzer decided that every patient should have a Breathalyzer test regardless of whether they drank alcohol. (R. 252 Tr. 58-59.) He monitored KAC's revenue every day. (R. 252 Tr. 59.)Berry testified that, after Dr. McClain confronted Bregenzer with the billing problems, Bregenzer did nothing to stop them. (R. 252 Tr. 17.)

Berry testified that Vanhoose was also aware that Dr. Alzadon billed under his dad's name and was aware that office visits were upcoded. She testified that Vanhoose acted according to the directives of Bregenzer and Berry. (R. 252 Tr. 19.)

The government presented text messages between Berry and Bregenzer about billing after they had become aware that they were under investigation. In those messages, Bregenzer states, "It's going to be problematic for us that we knew there was an issue and didn't address it. That's what will get us. Hard to just blame [Vanhoose]." (R. 252 Tr. 128.) Berry testified that this message was referring to everything KAC had been "doing wrong," all the issues that Dr. McClain had raised with KAC's billing practices. (R. 252 Tr. 128-29.)

This is sufficient evidence for a rational juror to find that Bregenzer was aware of and joined the conspiracy to commit health care fraud. As to the individual counts for healthcare fraud, under the *Pinkerton* doctrine, once a defendant joins a conspiracy, he is responsible for any substantive offenses committed by the coconspirators in furtherance of the conspiracy if those offenses are reasonably foreseeable. *United States v. Gilbert*, 725 F. App'x 370, 373 (6th Cir. 2018) (citing *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946)). A reasonable jury could find that all the individual counts for healthcare fraud were reasonably foreseeable given the scope of the conspiracy, were committed after Bregenzer joined the conspiracy, and were committed to help advance the conspiracy.

**B. Rule 33 Motion**

**1) KAC Employees' Invocation of their Fifth Amendment Rights**

As to his Rule 33 motion, Bregenzer asserts that the government violated his due process right to present a defense by intimidating witnesses into invoking their Fifth Amendment rights against self-incrimination instead of testifying in his favor. He also argues that the Court employed the wrong procedure in advising these witnesses of their Fifth Amendment rights.

"The Supreme Court has recognized that a party's right to present his or her own witnesses in order to establish a defense is a fundamental element of due process." *Johnson v. Bell*, 525 F.3d 466, 480 (6th Cir. 2008) (citing *Washington v. Texas*, 388 U.S. 14, 19 (1967)). "Government conduct that rises to the level of substantial interference with a witness's 'free and unhampered determination to testify' violates this right." *Id* (quoting *United States v. Foster*, 128 F.3d 949, 953 (6th Cir.1997)). However, "a defendant's right to compel testimony yields to a witness's assertion of his or her Fifth Amendment privilege when the claimed privilege is grounded on a reasonable fear of prosecution." *United States v. Highgate*, 521 F.3d 590, 593 (6th Cir. 2008). To balance these interests, the trial court must decide whether a witness's invocation of his Fifth Amendment rights is justified. If not, the Court must require the witness to testify. *Id*. at 594-94.

Bregenzer argues the government prohibited two witnesses from testifying: Trouper Krueger and Kristi Elrod, both of whom were employed at KAC. The government concluded that these witnesses faced potential criminal liability after interviewing them during its investigation. At trial, the government raised concerns to the Court about these witnesses testifying without the advice of counsel. This concern was valid. Bregenzer states in his motion that "witness after witness" implicated Krueger in the scheme to defraud and that "the Government recast Krueger as the scheme's hidden architect." (R. 271 Response 7, 8.) Moreover, at the time the government raised its concerns regarding these witnesses testifying, the Court had already made findings under *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978) that Krueger and Elrod were unindicted coconspirators. (R. 263 Tr. 267-73.)

Accordingly, after the defendants indicated they would call Krueger and Elrod to testify, the government requested that the Court ensure that these witnesses were advised

11

by counsel of their Fifth Amendment rights.  (R. 263 Tr. 271-289.)  During the government's investigation, Krueger was represented by attorney Anna Whites, who was also KAC's counsel. At trial, the government raised an issue as to whether Whites had a conflict in representing both KAC and Krueger. (R. 263 Tr. 279-80.) Bregenzer argues that the government raising this issue constitutes improper interference with his right to present a defense, but he cites no case law to support that.

Moreover, the Court conducted an inquiry with Whites outside the presence of the jury. (R. 267 Tr. 3.) Whites stated that she did indeed have a conflict that prohibited her from representing Krueger at trial. Accordingly, the Court appointed attorney Christopher Spedding to represent Krueger. (*Id*. at 3-4.) Bregenzer argues this was improper, but he cites no authority indicating that the Court should have required that Whites remain Krueger's counsel even after she determined that a conflict existed. The Court had no choice but to appoint new counsel to represent Krueger. As to Elrod, she had no counsel. Accordingly, the Court appointed attorney Jerrod Beck to meet with her to determine if she wanted counsel and, if so, to advise her regarding her potential testimony and Fifth Amendment rights. (R. 264 Tr. 73.)

Bregenzer argues that the government interfered with his right to a defense by even raising concerns with the Court about these witnesses testifying without advice of counsel. In *Davis v. Straub*, 430 F.3d 281, 287 (6th Cir. 2005), however, a similar procedure was employed. There, the prosecutor requested a sidebar with the judge and informed the court that a witness called by the defense was a suspect. The government requested that the witness be informed of his Fifth Amendment rights before he testified. The judge questioned the witness and appointed independent counsel to advise him of his rights. The Sixth Circuit determined that "neither the prosecutor's nor the judge's conduct was unconstitutional, especially considering the ethical obligation, imposed on prosecutors by

the ABA's model guidelines, to:

> advise a witness who is to be interviewed of his or her rights
> against self-incrimination and the right to counsel whenever
> the law so requires. It is also proper for a prosecutor to so
> advise a witness whenever the prosecutor knows or has reason
> to believe that the witness may be the subject of a criminal
> prosecution.

*Id*. at 287 (quoting ABA Standards for the Administration of Criminal Justice § 3–3.2(b)).

Citing *Hoffman v. United States*, 341 U.S. 479 (1951), Bregenzer argues that the Court should have conducted an inquiry regarding every question that the government intended to ask Elrod and Krueger to determine if they faced potential criminal liability for each question. In *Davis*, however, the Sixth Circuit stated that *Hoffman* "announced no rule proscribing the blanket assertion of the privilege against self-incrimination." *Davis*, 430 F.3d at 288.

*Hoffman* broadly construed the Fifth Amendment to cover "any individual who might be incriminated by the evidence in connection with which the privilege is asserted." *Zurcher v. Stanford Daily*, 436 U.S. 547, 561 n.8 (1978). It is true that a "witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified." *Hoffman*, 341 U.S. at 486. Here, however, the Court did not decide based solely on the say-so of Elrod and Krueger that they might be incriminated if they testified in this case. The Court made that determination after hearing all the evidence of the government's case-in-chief and finding that both Elrod and Krueger were unindicted coconspirators in a conspiracy for which it is undisputed the applicable statute of limitations had not run.

In addition, as discussed, the Court appointed counsel for both potential witnesses and directed that a packet of relevant materials be delivered to them. (R. 263 Tr. 279, 286-

13

87.) After giving the attorneys an opportunity to review the materials and consult with their clients, the Court conducted an inquiry with attorneys Spedding and Beck outside the presence of the jury.

Spedding stated that he had advised Krueger to invoke his Fifth Amendment rights against self-incrimination as to any questions asked of him. (R. 267 Tr. 5.) Bregenzer's counsel requested that the Court call Krueger to the stand outside the presence of the jury to invoke his Fifth Amendment rights. (R. 267 Tr. 5-6.) The Court did so, and Krueger invoked his Fifth Amendment rights. (R. 266 Tr. 17-18.) Likewise, attorney Beck advised the Court that Elrod had accepted legal representation and that, after consulting with Beck, she intended to invoke her Fifth Amendment right against self-incrimination. (R. 265 Tr. 3.)

It is true that "the longstanding rule of this circuit is that a defendant must take the stand and answer individualized questions in order to invoke his Fifth Amendment privilege." *In re Flint Water Cases*, 53 F.4th 176, 210 (6th Cir. 2022) (quoting *United States v. Bates*, 552 F.3d 472, 475 (6th Cir. 2009)). "Generally, a blanket assertion, by itself, does not demonstrate the 'reasonable fear of danger of prosecution' needed to invoke the privilege." *Id.* (quoting *United States v. Highgate*, 521 F.3d 590, 593–94 (6th Cir. 2008)). But this is not true "in instances where the witness has a clear entitlement to claim the privilege." *Id*. (quoting *United States v. McAllister*, 693 F.3d 572, 583–84 (6th Cir. 2012)). "In such a case, the reason behind the rule does not apply because the court already knows that 'reasonable cause' to invoke the privilege exists." *Id* (quoting *McAllister*, 693 F.3d at 583).

Here, no defendant requested that the Court conduct a question-by-question inquiry of Krueger or Elrod. More importantly, as explained, it was clear that Krueger and Elrod were entitled to claim the privilege.

14

Bregenzer also appears to argue that the Court should have compelled the government to grant Krueger immunity to testify. (R. 271 Motion 8-10.) Generally, however, this Court has no power to immunize witnesses or to force the government to do so because that power is entrusted to the executive branch. *United States v. Mohney*, 949 F.2d 1397, 1401 (6th Cir. 1991). The Sixth Circuit has discussed two "limited situations where it "may be warranted" for a court to compel immunity: "if it is necessary to enable a defendant to present an effective defense and/or where it is necessary to remedy prosecutorial misconduct." *United States v. Meda*, 812 F.3d 502, 518 (6th Cir. 2015).

As to first exception, this is valid "only if the government selectively granted immunity to its own witnesses but denied immunity to the defendant's witnesses." *United States v. Meda*, 812 F.3d 502, 518 (6th Cir. 2015). Here, the government did not grant immunity to any witnesses. It granted Krueger only use-immunity with regard to his proffer statement. As to any prosecutorial misconduct, Bregenzer seems to argue that the government distorted the fact-finding process here because it "selectively invoked immunity" by granting Krueger use immunity during its investigation but not granting him full immunity. (R. 271 Motion 9.) He cites no case law, however, indicating that this is improper.

Regardless, Bregenzer has not identified how Krueger's testimony was essential to his defense. He argues, at most, that Krueger's testimony might have been exculpatory as to Krueger.

### 2) Proposed Exhibits Regarding Krueger's Culpability

While Bregenzer argues that the Court erred in permitting Krueger to plead the Fifth Amendment on advice of counsel, he also argues that he is entitled to a new trial precisely because the government introduced evidence indicating Krueger's culpability in the scheme to defraud. He argues that allowing the introduction of this incriminating

15

evidence was unfair because he was unable to rebut that evidence since Krueger did not testify. This argument also fails.

At trial, after Krueger invoked his Fifth Amendment rights, Bregenzer moved for a mistrial arguing that he was unable to admit nine exhibits, consisting largely of e-mails sent or received by Krueger. (R. 266 Tr. 6.) Bregenzer argued the exhibits could only be admitted through Krueger or another KAC representative, all of whom he argued would be appointed standby counsel and advised to invoke their Fifth Amendment rights as Krueger and Elrod had been. (R. 266 Tr. 6-7.) Further, he argued, KAC had new ownership and none of the current owners could certify the emails as business records. (R. 266 Tr. 11.)

The Court painstakingly reviewed each of the exhibits that Bregenzer relied on for his argument that a mistrial was warranted. (R. 266 Tr. 20-61.) The Court determined that many of the proposed exhibits would not have been admissible even if Krueger did testify. Other proposed exhibits were emails sent after the time period of the conspiracy and after KAC employees, including Krueger and Elrod, had become aware of the government's investigation. Thus, they were not probative of any employee's intent at the time of the charged conspiracy. The Court found Bregenzer could have admitted other proposed exhibits through witnesses who had testified at trial. Bregenzer does not argue that the Court erred in any of these findings.

Most importantly, none of the proposed exhibits were exculpatory to Bregenzer. Bregenzer does not argue that they are. Instead, he argues they were exculpatory as to Krueger. Again, many of the emails occurred after Krueger was aware that the government was investigating KAC. Thus, they are not illuminating as to Krueger's state of mind or knowledge at the time of the conspiracy charged. Regardless, none of the proposed exhibits that Bregenzer relied on for his mistrial argument is exculpatory as to him.

In his motion, Bregenzer specifically discusses only one of the proposed exhibits: an

16

August 2021 email from Trouper Krueger to Barbie VanHoose. (R. 271 Motion 8 (citing R. 266 Tr. 25.)) This is after the time of the charged conspiracy. It is also after the KAC employees were aware of the federal investigation and after the search warrant was executed. In the email, Krueger discusses the 99046 billing code, which is the code for smoking cessation counseling. Krueger instructs Vanhoose that, "If the notes support 990406, then we can use it." (R. 266 Tr. 28.) At trial, Bregenzer argued that the email rebuts the government's accusations that KAC billed for smoking cessation whether it occurred or not. (R. 266 Tr. 28.)

As the Court explained at trial, the email would not have been admissible even if Krueger did testify because it is hearsay and does not fall under any exception to the hearsay rules. Further, because this email exchange took place after KAC employees, including Krueger and VanHoose, were aware of the government's investigation of KAC's billing practices, it was not relevant to Krueger's or VanHoose's state of mind at the time of the conspiracy. Moreover, as the Court also explained at trial, the email exchange discussing KAC's implementation of new procedures after becoming aware of the government investigation may have well been damaging to the defendants. Most importantly, however, the email has nothing to do with Bregenzer. He is not part of the email exchange, and he is not discussed in the exchange. It in no way exculpates him. Accordingly, Bregenzer's inability to admit the email exchange was not grounds for a mistrial and is not grounds for a new trial.

### 3) Jury Instructions

#### a) Conspiracy to Unlawfully Distribute Suboxone

Bregenzer argues that the Court erred in Jury Instruction No. 15, which addressed the charge for conspiring to unlawfully distribute controlled substances in violation of 21 U.S.C. § 843(a)(2). That statute makes it a federal crime to "use in the course of the . . .

distribution[] or dispensing of a controlled substance . . . a registration number which is . . . issued to another person." Here, the defendants were charged with conspiring to distribute Suboxone using a registration number issued to another person.

Bregenzer argues that the Court should have instructed the jury that it must find that the defendants knew each prescription charged in the conspiracy was unauthorized. For this argument, he relies on *Ruan v. United States*, 597 U.S. 450, 454 (2022). *Ruan*, however, involved a different statute than this case. It involved convictions under 21 U.S.C. § 841(a)(1), which makes it a crime, "[e]xcept as authorized" for any person to knowingly or intentionally dispense a controlled substance.

In *Ruan*, the defendants were doctors. A doctor is authorized to dispense controlled substances in certain circumstances. Thus, the issue before the Court was how to interpret the language "except as authorized" at the beginning of the statute when the defendant is a doctor. "Is it sufficient for the Government to prove that a prescription was *in fact* not authorized, or must the Government prove that the doctor *knew* or *intended* that the prescription was unauthorized?" *Id*. at 455. The Court determined that "the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so." *Id*.

In contrast, the statute at issue here—§ 843(a)(2)—does not contain the language "except as authorized." It is illegal under § 843(a)(2) to use another person's registration number to dispense controlled substances whether the other person authorizes it or not. The statute does not set forth any exceptions to this rule.

Despite *Ruan*'s inapplicability to this case, however, the Court agreed to instruct the jurors that, to convict on this charge, they must find that two or more persons conspired to use Dr. Ricardo's registration number "in a manner they knew was unauthorized." (R. 224 Instruction No. 15.) The jury convicted the defendants even under this more demanding

18

standard.

### b) Health Care Fraud

Bregenzer argues that the Court erred in giving instructions for *Pinkerton* liability, aiding and abetting, and deliberate ignorance for the eight health-care fraud charges.

As an initial matter, the Court did not give a deliberate ignorance instruction. Bregenzer is simply mistaken on this point.

As to *Pinkerton*, once a defendant joins a conspiracy, he is responsible for any substantive offenses committed by the coconspirators in furtherance of the conspiracy if those offenses are reasonably foreseeable. *United States v. Gilbert*, 725 F. App'x 370, 373 (6th Cir. 2018) (citing *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946)). Bregenzer argues that a *Pinkerton* instruction is appropriate only when the means rea for the underlying offense is "knowingly" or something less culpable. The mens rea for healthcare fraud is "knowingly and willfully." Thus, Bregenzer argues, the Court erred in giving the *Pinkerton* instruction for this offense.

For this argument, Bregenzer cites *Gilbert*. Nothing in that case indicates that *Pinkerton* liability does not apply to crimes that have a *mens rea* of "knowingly and willfully." Multiple courts of appeals have indicated that it is appropriate to give a *Pinkerton* instruction in cases involving a health-care fraud conspiracy. *See, e.g., United States v. Ifediba*, 46 F.4th 1225, 1243 n. 10 (11th Cir. 2022) ("Ifediba does not challenge his conviction for conspiracy to commit health care fraud, and, as a co-conspirator, he is liable for the reasonably foreseeable crimes that his co-conspirators committed in furtherance of the conspiracy."); *United States v. Chalker*, 966 F.3d 1177, 1189 (11th Cir. 2020) ("This evidence was sufficient to allow the jury to find Chalker guilty beyond a reasonable doubt of the substantive counts of healthcare fraud under the doctrine established by *Pinkerton v.*

19

*United States*, 328 U.S. 640 (1946)); *United States v. Robinett*, 832 F. App'x 261, 265 (5th Cir. 2020) ("Likewise, there was sufficient evidence to convict on . . . the substantive health care fraud charges. . .  Each substantive offense was the 'foreseeable' outgrowth of having engaged in a conspiracy to defraud Medicare. Under the *Pinkerton* doctrine, the jury was entitled to convict him on the substantive counts as well.") (cleaned up). The Court has not found any authority supporting Bregenzer's argument that the *Pinkerton* instruction was improper for the health-care fraud charges.

As to the aiding-and-abetting instruction on the health-care fraud counts, aiding and abetting is "a theory of liability 'embodied in every federal indictment, whether specifically charged or not.'" *United States v. Underwood*, 129 F.4th 912, 943 (6th Cir. 2025), *cert. denied*, No. 25-5329, 2025 WL 2824485 (U.S. Oct. 6, 2025) (citation omitted). The Court may give an instruction on aiding and abetting as an alternative theory even if the indictment does not include aiding and abetting language and does not refer to the aiding and abetting statute, 18 U.S.C. § 2. *United States v. McGee*, 529 F.3d 691, 695-96 (6th Cir. 2008). Here, an aiding-and-abetting instruction was particularly appropriate. The indictment cited the aiding-and-abetting statute, and the evidence here supported aiding-and-abetting liability.

### 4)  Defendant Jose Alzadon's Credentials with Insurer WellCare

Bregenzer argues that the government committed prosecutorial misconduct by arguing that Dr. Alzadon was not credentialed with WellCare. The government asserted at trial that this was the reason KAC could not bill WellCare for services provided by Dr. Alzadon and instead billed as if the services were provided by Dr. Ricardo. Bregenzer argues that Dr. Alzadon was credentialed with WellCare and that the government knew that but withheld that evidence from the jury.

The government, however, introduced evidence showing Dr. Alzadon's credentials

20

with WellCare through the years. That evidence showed that Dr. Alzadon's status with WellCare was complicated. WellCare denied him credentials in 2016 and 2017. (Gov. Ex. 350, 351). Then, in 2019, WellCare granted him credentials for one of KAC's legal entities (KAC), but WellCare denied him credentials for another KAC entity (New Age Vitality Clinic). (Gov. Ex. 352, 223.) The government presented evidence that medical services were billed by New Age. Only counseling services were billed by KAC. (R. 252 Tr. 60.) Berry testified that Dr. Alzadon was unable to get credentialed with WellCare or Molina but that his father was credentialed with both insurers. (R. 252 Tr. 31.)

All of this evidence was presented to the jury. Accordingly, Bregenzer is not entitled to a new trial on the basis that the government withheld information regarding Alzadon's credentials with WellCare.

### 5) The Court's *Enright* Findings

Bregenzer briefly argues that the Court was required to have a hearing to make *Enright* findings. The Court conditionally admitted the coconspirator statements into evidence and made the findings after hearing all the government's evidence. (R. 263 Tr. 272-73.) This complies with the procedures set forth in *United States v. Vinson*, 606 F.2d 149, 152-53 (6th Cir. 1979) and is the approach favored in the Sixth Circuit. *See, e.g., United States v. White*, No. 2:17-CR-20489-TGB-EAS, 2023 WL 4567717, at *2 & n.1 (E.D. Mich. July 17, 2023) (citing cases). In his reply brief, Bregenzer argues that the Court failed to conduct a "statement-by-statement analysis" to determine if each statement by a coconspirator was made in furtherance of the conspiracy. Bregenzer does not, however, identify any conspirator statement admitted at trial that was not made in furtherance of the conspiracy.

21

### III.    Vanhoose and Alzadon's Motions

Vanhoose and Dr. Alzadon jointly filed their own Rule 29 and 33 motions. They also joined in Bregenzer's motions.

### A.  Excluding Krueger and Elrod Emails, Texts, and Statements

Dr. Alzadon and Vanhoose first argue that the Court erred in excluding as hearsay emails, texts, and statements from Krueger and Elrod. They argue that the Court should have admitted these out-of-court statements under Federal Rule of Evidence 804(b)(6). That rule provides an exception to the hearsay rules for a "statement offered against a party that wrongfully caused – or acquiesced in wrongfully causing – the declarant's unavailability as a witness, and did so intending that result." Dr. Alzadon and Vanhoose do not identify the precise evidence that they argue the Court wrongfully excluded. Regardless, however, as discussed above, the Court cannot find that the government caused Krueger's or Elrod's unavailability, wrongfully or otherwise. Instead, these defendants invoked their Fifth Amendment right after the Court found them to be coconspirators and they consulted with court-appointed counsel.

### B.    Sufficiency of the evidence

For their Rule 29 motion, Vanhoose and Dr. Alzadon argue the government did not present sufficient evidence to support Dr. Alzadon's convictions for healthcare fraud, conspiracy to commit healthcare fraud, aggravated identify theft, or conspiracy to unlawfully distribute a controlled substance. While Vanhoose moved to join the motion, the motion does not make any argument about the sufficiency of the evidence for Vanhoose's convictions. Nevertheless, the Court will address some of the evidence offered in support of Vanhoose's convictions in this opinion.

### 1)  Health Care Fraud Charges and Conspiracy

Like Bregenzer, Dr. Alzadon and Vanhoose do not dispute that the government presented sufficient evidence that KAC engaged in the three kinds of fraudulent billing practices discussed above. They argue, however, that the government did not present evidence that Dr. Alzadon knew about the billing practices or that he agreed to engage in them. They argue that Dr. Alzadon had "limited knowledge and participation in the billing and coding process." (R. 272 Mem. 5.) They also argue that the government did not present sufficient evidence that Dr. Alzadon entered into a criminal agreement to commit healthcare fraud.

The Court will first address whether there was sufficient evidence that Dr. Alzadon conspired to commit health care fraud. If so, then, pursuant to *Pinkerton*, the jury could find him guilty of the individual fraud charges as long as they found the crimes were committed by other members of the conspiracy after Alzadon joined the conspiracy, were reasonably foreseeable, and were committed to help advance the conspiracy.

The government presented evidence that Dr. Alzadon agreed with others to commit health care fraud. Among the billing concerns that caused Dr. McClain to resign from KAC was Dr. Alzadon repeatedly billing the same patient for smoking cessation counseling (R. 245 Tr. 24-25); Dr. Alzadon's use of Dr. Ricardo's DEA identification to prescribe Suboxone; Dr. Alzadon's representation in billing records that Dr. Ricardo was treating patients that were actually treated by Dr. Alzadon; and Dr. Alzadon's "possible charging for services not rendered or reviewed." (R. 245 Tr. 83-87; Gov. Ex. 1, 2.) Dr. Alzadon was included on the emails that Dr. McClain sent regarding these concerns.

The government presented a patient's medical record indicating that Dr. Ricardo provided smoking cessation counseling. The patient testified, however, that 1) she was treated by Dr. Alzadon and 2) never received smoking cessation counseling. (R. 255 Tr. 74-75, 79-80, 81.)

23

Further, the government presented evidence that Dr. Alzadon was involved in upcoding. A 99213 code on a medical bill indicates that a detailed "problem-focused" examination was performed that typically takes at least 15 minutes. (R. 256 Tr. 171, 224.) A 99214 code, in contrast, is not problem focused. It typically indicates a visit of at least 25 minutes and involves a detailed history of the patient to determine what is wrong. It is "more like a mystery to solve," looking at different tests and diagnoses. (R. 256 Tr. 116, 224.)

The government presented evidence that between October 2017 and December 2020, all Dr. Alzadon's and Dr. Ricardo's office visits were billed under either the 99213 or 99214 code. (Gov. Ex. 77e.) Berry testified, however, that Dr. Alzadon spent only two to three minutes with each patient. She observed this in the KAC Winchester office. (R. 252 Tr. 40.) Multiple patients testified that their visits with Dr. Alzadon were less than fifteen minutes, often only a few minutes. (R. 251 Tr. 12; R. 255 Tr. 76; R. 256 Tr. 9; R. 258 Tr. 80; R. 258 Tr. 128.)

Dr. McClain observed Dr. Alzadon treating patients that Dr. Alzadon and Berry informed her were Dr. Ricardo's patients. (R. 245 Tr. 59-61.) Dr. McClain testified that she told Kristy Elrod and Dr. Alzadon that using the credentials of another doctor to prescribe controlled substances and that billing for medical services provided by Dr. Alzadon under another doctor's name could be considered fraud. (R. 245 Tr. 61-63.) As discussed, Dr. McClain raised her concerns with various KAC representatives, including Dr. Alzadon. (R. 245 Tr. 25-26, 54, 83; Gov. Ex. 1.)  This happened in late September 2019. (Gov. Ex. 1.) In January 2021, Dr. Alzadon was still billing under his father's name because KAC believed he was not credentialed with certain insurers. (Gov. Ex. 470.)

The government presented text messages between Berry and Dr. Alzadon, in which Berry informed Dr. Alzadon that some of the patients he was seeing were being billed to his

father. (Gov. Ex. 470.) This exchange occurred in January 2021, when Dr. Alzadon complained to Berry that he was losing patients and was losing income as a result. In response, Berry confirmed to him that he was still seeing patients that were being billed under his father's name. She explained that this billing practice was being followed because Dr. Alzadon could not get credentialed to bill certain insurance companies. (Gov. Ex. 470.)

Again, KAC owner Berry pleaded guilty to conspiring with Dr. Alzadon, Bregenzer, and Vanhoose to commit healthcare fraud and to unlawfully distribute controlled substances. She testified that the scheme involved Dr. Alzadon seeing his dad's patients and billing as if Dr. Ricardo had seen them; others using Dr. Ricardo's DEA number to prescribe controlled substances; upcoding medical services; and billing for services not rendered. (R. 252 Tr. 17.) She testified that Alzadon, Bregenzer, and Vanhoose all participated in these crimes. (*Id.*)

Berry testified that the reason Dr. Alzadon billed under his father's name was because he could not get credentialed with insurers WellCare or Molina (formerly Passport) but that his father was credentialed with both insurers. (R. 252 Tr. 31, 95-97.) She testified that Dr. Alzadon would see patients insured by WellCare and Molina but would represent that his father had seen them. (R. 252 Tr. 31.) She testified that Dr. Alzadon said there was nothing wrong with that practice. (R. 252 Tr. 39.)

As to Vanhoose's knowledge, Berry testified that Vanhoose was aware that Dr. Alzadon was seeing his dad's patients and then billing for those services as though his dad had seen them. Berry testified that Vanhoose was also aware that office visits were upcoded. She testified that she and Bregenzer instructed Vanhoose to bill in that manner. (R. 252 Tr. 19.)

Berry testified that Vanhoose knew about Dr. Alzadon's problems getting credentialed with some insurers. (R. 252 Tr. 30.) Berry testified that Vanhoose scheduled

25

the appointments for doctors, so she knew which doctors were credentialed with which insurers. (R. 252 Tr. 30.) She testified that it was Vanhoose who assigned Dr. Ricardo's patients to Dr. Alzadon. (R. 252 Tr. 261.)

In her recorded interview with the FBI, VanHoose admitted that she knew that Dr. Alzadon treated Dr. Ricardo's patients. (Gov. Ex. 400.) She stated that KAC employed this practice because Dr. Alzadon was not credentialed with certain insurers, but his father was. (Gov. Ex. 403.)

Berry testified that Bregenzer, Krueger, and Vanhoose handled all the coding. (R. 252 Tr. 92.) The government presented evidence that, in June 2019, Vanhoose directed staff to start billing for more lengthy visits and for more complicated services regardless of the services provided and actual length of the visits. She directed, "we are going to start billing the Medicare people the 99214 code instead of the 99213. . . ."  (Gov. Ex. 206.)

Thus, the government presented sufficient evidence that Vanhoose and Dr. Alzadon agreed to commit healthcare fraud. A rational juror could find that all of the charged counts of health care fraud occurred after Alzadon and Vanhoose joined the conspiracy and that all the charged counts helped advance the broader conspiracy and were reasonably foreseeable. This is sufficient evidence to convict Alzadon and VanHoose of the individual charges of health care fraud.

### 2) Aggravated Identity Theft

Count 12 charged the defendants with using Dr. Ricardo's National Provider Identifier (NPI) as part of the conspiracy to commit healthcare fraud charged in Count 1. Count 13 charged the defendants with using Dr. Ricardo's NPI in relation to a specific count of healthcare fraud, which involved a patient identified as TM. The jury found Dr. Alzadon and Vanhoose guilty of both charges and found Bregenzer not guilty of both.

26

Dr. Alzadon argues that there is no evidence that he used the NPI number himself in connection with the healthcare fraud conspiracy. He argues that the evidence showed only that the front desk staff used the tokens. These charges, however, do not deal with use of the tokens. They deal with the use of Dr. Ricardo's NPI number.

As to Count 12, as discussed above, the government presented evidence that Dr. Alzadon and Vanhoose agreed to indicate on medical records and bills that Dr. Ricardo treated patients that Dr. Alzadon treated. The government presented an insurance claim form showing that payment for medical services requires the physician's NPI number. (Gov. Ex. 80a.) The government also presented instructions from the state Medicaid department explaining that the physician's NPI number must be included on all transactions. (Gov. Ex. 604.) The government presented multiple patient charts and insurance claim forms purporting to be signed by Dr. Ricardo and containing his NPI number. (*See e.g.*, Gov. Ex. 101 (claim forms beginning at 3666); 102 (claim forms beginning at 2296); 103 (claim forms beginning at 2708); 104 (claim forms beginning at 4228).) The government also presented multiple e-script prescriptions purporting to be signed by Dr. Ricardo and containing his NPI number. (Gov. Ex. 151-156.) This is sufficient evidence from which a rational juror could conclude that Dr. Alzadon, the medical doctor seeing the patients, and Vanhoose, the billing manager, used Dr. Ricardo's NPI number in connection with the health care fraud conspiracy.

As to Count 13, this count dealt specifically with medical services provided to patient TM on January 16, 2020. The government presented TM's medical records from that date, which indicated that the provider was Dr. Ricardo. (Gov. Ex. 103 at 375-80.) TM testified, however, that she saw Dr. Alzadon while she was a patient at KAC. (R. 258 Tr. 78-79.) She testified that, while Dr. Ricardo was present on occasion, he never provided her with medical treatment. (R. 258 Tr. 79.) She testified Dr. Ricardo was not the doctor she

27

saw on January 16, 2020. (R. 258 Tr. 81-82.) A juror could reasonably find that Dr. Alzadon and Vanhoose used Dr. Ricardo's NPI to bill for the January 16, 2020 services provided to TM.

### 3) Conspiracy to Unlawfully District a Controlled Substance using Dr. Ricardo's DEA registration number.

Like Bregenzer, Dr. Alzadon argues that the government presented insufficient evidence to support his conviction for conspiring to distribute a controlled substance using another person's DEA registration number. He does not dispute that Dr. Ricardo's DEA registration number was used to send in prescriptions that Dr. Alzadon authorized. Nor does he dispute that the KAC front-desk employees used his and Dr. Ricardo's DEA registration number to authorize prescriptions. He argues that the government presented no evidence that he used the registration number of Dr. Ricardo.

For this conspiracy charge, however, the government need not prove that Dr. Alzadon himself used the DEA registration number of another person. It must prove that he agreed to that conduct by others and intended that others engage in it.

Dr. McClain testified that Dr. Alzadon had possession of Dr. Ricardo's electronic token to prescribe Suboxone. (DE 245 Tr. 58.) As discussed, the government presented evidence that Dr. Alzadon treated patients listed as Dr. Ricardo's patients. Dr. McClain testified that she told Dr. Alzadon himself that using the credentials of another doctor to prescribe controlled substances and that billing for medical services provided by Dr. Alzadon under another doctor's name could be considered fraud. (R. 245 Tr. 61, 62-63.) The government presented evidence that Dr. Ricardo's and Dr. Alzadon's electronic tokens were kept at the front desk and readily accessible by employees. (R. 251 Tr. 78-85.)

Vanhoose was aware that people at the front desk sent in prescriptions using both Dr Ricardo's and Dr. Alzadon's registration numbers and tokens. (R. 251 Tr. 90-91; Gov. Ex.

402.) In her government interview, VanHoose stated that she and members of the front office staff used the tokens to send prescriptions. (Gov. Ex. 402.) She stated that Krueger and Berry told her the tokens belonged to KAC, not the doctors. Vanhoose stated in her interview that Dr. Alzadon told her to use his token to send in prescriptions he authorized because he did not have time. (Gov. Ex. 402.) Vanhoose stated that she felt it was wrong for KAC staff other than the doctors to use the tokens to prescribe medications, but she needed to provide for her family. (Gov. Ex. 402.)

KAC front desk employee Maria Maturino testified that she used Dr. Ricardo's token to prescribe Suboxone. She knew both Dr. Ricardo's and Dr. Alzadon's passwords and had memorized them from continuous use. (R. 259 Tr. 114-15.) She testified that she sent prescriptions using the dual-factor authentication method for patients listed as Dr. Ricardo's when Dr. Alzadon was the treating physician. (R. 259 Tr. 117.)

Berry testified that she instructed the staff to use the providers' electronic tokens to prescribe medications. (R. 252 Tr. 169-70.) The government presented evidence that Berry later instructed the staff to stop doing that, but that, even after that instruction, Vanhoose continued to use the tokens to prescribe medications. (Gov. Ex. 209; R. 252 Tr. 171.)

This is sufficient evidence to support the convictions of Vanhoose and Alzadon for conspiring to distribute a controlled substance using the DEA registration number of another person.

Dr. Alzadon argues that the government presented no evidence that he used his father's token without Dr. Ricardo's authorization. However, as discussed, such evidence is not necessary for a conviction under Section 843(a)(2). It is a federal crime to use the DEA registration number of another person to dispense controlled substances, whether that person authorizes the use or not.

## IV.    Conclusion

For all these reasons, the Court hereby ORDERS that motions for judgment of acquittal and motions for new trial (R. 271, 272) filed by defendants Bregenzer, Vanhoose, and Alazdon are DENIED.

\* \* \* \*  \* \* \* \*

This 20th day of January, 2026.

Signed By:

*__Karen K. Caldwell__*

**United States District Judge**